UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GREATER YELLOWSTONE COALITION,<br>                    Plaintiff,<br><br>        v.<br><br><br>U.S. FOREST SERVICE,<br>                    Defendant. | Case No. 4:12-cv-00384-REB<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |

Pending before the Court are Defendant's Motion for Summary Judgment (Dkt.

23) and Plaintiff's Cross-Motion for Summary Judgment (Dkt. 33). The dispute centers

on a motorized vehicle trail proposed by the Forest Service in the Caribou Targhee

National Forest, which Plaintiff argues will impact the forest's waters and other

characteristics. The Court has considered the briefing, and oral arguments, and otherwise

being fully advised, both motions are granted in part and denied in part for the reasons

explained below.

## FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Greater Yellowstone Coalition (the "Coalition") challenges the United

States Forest Service's ("Forest Service") proposed Winschell Dugway All Terrain

Vehicle ("ATV") Trail Project (the "Project"). The Project's stated goal is to provide visitors with the unique opportunity to experience mining history within the Soda Springs District of the Caribou National Forest. Def.'s Mem., p. 7 (Dkt. 32); (AR 17081) (describing the "purpose and need" of the Project as improving "motorized trail opportunities and provid[ing] a unique recreational experience allowing visitors to experience mining history within the project area while reducing sedimentation and erosion cause by motorized travel within the project area").

The Project involves constructing and reconstructing[1] 7.8 miles of motorized trail and upgrading a 3.7 mile non-motorized trail. Def.'s Mem., p. 7 (Dkt. 32); Compl., ¶ 46 (Dkt. 1). The proposed trail starts at the southern end of the historic Winschell Dugway wagon road and terminates at Caribou City in the north. Def.'s Mem., p.7 (Dkt. 32); Compl., ¶ 52 (Dkt. 1). Additionally, as part of the Project the Forest Service will relocate 1.2 miles of the North Fork Eagle Creek ATV Trail to eliminate numerous water crossings. Def.'s Mem., p. 7 (Dkt. 32); Compl., ¶ 46 (Dkt. 1).

In August 2007, the Forest Service mailed a notice to interested parties seeking comments on the Project. Def.'s Statement of Fact, ¶ 9 (Dkt. 34). In 2011, the Forest Service published an Environmental Assessment for the Project and issued a Decision Notice and Finding of No Significant Impact. The Coalition administratively appealed

---

[1] "[N]ew construction is building a trail where no trail or road previously existed. Reconstruction is improving an old or degraded road or trail prism to current trail standards." AR 17100.

the Forest Service's approval of the Project. *Id.* at ¶ 10. After consideration, the Appeal

Deciding Officer reversed the decision, stating that the Project record did not "clearly

show that the project is consistent with the Forest Plan." *Id.*

The Forest Service published an updated Environmental Assessment ("EA")[2] for

the Project in January 2012, and the Decision Notice and Finding of No Significant

Impact was issued in February 2012. Def.'s Statement of Fact, ¶ 11 (Dkt. 34); AR

17192–203. The Coalition administratively appealed the Decision Notice, which

ultimately was affirmed by the Appeal Deciding Officer with direction to "not proceed

with ground disturbing activities covered under the [Decision Notice and Finding of No

Significant Impact] until the final location of [a not precisely located 0.5 mile portion of]

the trail is identified and laid out on the ground." Def.'s Statement of Fact, ¶ 11 (Dkt.

34). The Appeal Deciding Officer also recommended that the Forest Service "conduct

and document an Interdisciplinary team sufficiency review of this final location to

determine whether it changes the effects disclosed . . . ." *Id.*

Under direction of the Appeal Deciding Officer's decision, the Forest Service

field-verified the final trail location for the 0.5 segment of trail. Def.'s Statement of Fact,

¶12 (Dkt. 34). The Forest Service found that "[t]his section of trail will traverse some

steep, but stable, mountain slopes along the corridor of the old roadbed . . . ." *Id.*

Ultimately, the Forest Service determined that "the current range of effects is within the

---

[2] Unless otherwise stated, all references to the EA are to the updated 2012
Environmental Assessment.

scope of the effects disclosed in the previous analyses, . . . revision of the [Environmental Assessment] is not necessary," and preparation of an Environmental Impact Statement ("EIS") is not necessary.  *Id.* at ¶ 13.

The Coalition contends that the Forest Service failed to adequately disclose and discuss the effects of the proposed action in the revised (2012) Environmental Assessment.  Compl., ¶¶ 108, 122, 128.  The Coalition further claims that the inadequate disclosures led to the Forest Service's failure to prepare an EIS, a decision it argues was arbitrary, capricious, and not in accordance with the law.  Compl., ¶ 145 (Dkt. 1).  The Coalition alleges that these actions violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), the Administrative Procedure Act ("APA"), and their implementing regulations.  An injunction is sought to prevent the Forest Service from proceeding with the Project and the Coalition also asks that the Forest Service be ordered to withdraw the Project's Environmental Assessment and Decision Notice.[3]

---

[3]  The Coalition has abandoned a fourth claim for relief, made in its Complaint, for Failure to Disclose and Analyze Opposing Scientific Opinion Regarding the Effects of the Proposed Action on Soils and Fisheries.  *See* Pl.'s Mot. Summ. Jdmt., p. 3 (Dkt. 23).  This claim relates to a Biological Evaluation performed by a former fisheries expert for the Forest Service, James Capurso.  Mr. Capurso's evaluation concluded that a Forest Service preferred alternative would violate five fisheries-related standards of the Caribou Revised Forest Plan, but a second evaluation of the Project's effects completed in 2011 reached conclusions opposite to those of Mr. Capurso.  Compl., ¶¶ 132-33.

The Forest Service strongly contests the Coalition's claims, and requests summary judgment in its favor with a declaration that it did not violate NEPA, NFMA, or the APA in designing and approving the Winschell Dugway ATV Trail Project. Thus, the Forest Service asks the Court to deny the Coalition's Motion for Summary Judgment, grant summary judgment to the Forest Service, and dismiss this case.

## MOTIONS FOR SUMMARY JUDGMENT

The Coalition generally argues that the Forest Service could have chosen the No Action Alternative and declined to construct a trail at all because ATV access to Caribou City already exists and the landscape in the project area is unsuitable for an ATV trail due to steep slopes and unstable soils. The Coalition contends that Alternative Four from the EA also could have been chosen, resulting in construction of only a non-motorized trail. The Coalition contends that the alternative selected by the Forest Service was the result of an arbitrary and capricious decision. The Forest Service disagrees, arguing that neither option met the Project's purpose "to improve motorized trail opportunities and provide a unique recreation experience allowing visitors to experience mining history within the project area while reducing sedimentation and erosion caused by motorized travel within the project area." Def.'s Mem., p. 31 (citing AR 14487).

## A.  Legal Standards

This is an administrative review proceeding. The record is that of the administrative record before the agency. Consequently, the parties seek to resolve this action as a matter of law on their respective cross-motions for summary judgment.

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

NFMA requires the Forest Service to "develop, maintain, and as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Once a forest management plan has been developed, the Forest Service is required to manage its lands in accordance with the plan. *Id.* § 1604(i). The Forest Service adopted its current Caribou Revised Forest Plan ("Forest Plan") for the Caribou section of the Caribou-Targhee National Forest in 2003. *See* AR 1.

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS "shall provide full and fair discussion of [the] significant environmental impacts" of the proposed action. 40 C.F.R. § 1502.1. That discussion serves two purposes:

> First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.
>
> Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (internal quotation marks, brackets, and citation omitted). By focusing agency and public attention on the environmental effects of proposed agency action, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

Thus, NEPA requires that major agency decisions significantly affecting the environment consider the impacts of those decisions and explore possible alternatives, before a decision is reached. 42 U.S.C. §§ 4321, *et seq.*; 40 C.F.R. § 1501.1. NEPA's procedures ensure the so-called "hard look" at the environmental consequences of a federal agency's proposed action in advance of a final decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). Agency decisions governed by NEPA are reviewable under the APA, 5 U.S.C. §§ 701-706. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990); *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003).

Under the APA, agency action must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986). A decision is arbitrary and capricious if the Service:

> relied on factors Congress did not intend it to consider,
> entirely failed to consider an important aspect of the problem,
> or offered an explanation that runs counter to the evidence
> before the agency or is so implausible that it could not be

        ascribed to a difference in view or the product of agency
        expertise.

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotation

marks omitted), *overruled on other grounds by Winter v. Natural Res. Def. Council*, 555

U.S. 7 (2008); *see also League of Wilderness Defenders-Blue Mountains Biodiversity

Project v. U.S. Forest Serv*., 689 F.3d 1060, 1068 (9th Cir. 2012).

        Consideration of whether an agency action is arbitrary and capricious requires the

court to review whether the agency considered the relevant factors and articulated a

rational connection between the facts found and the choices made. *Pac. Coast Fed'n of

Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001). If the agency

decision was based on the relevant factors and there is no clear error of judgment, the

reviewing court may not overturn the agency's action as arbitrary and capricious.

*Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987).

        "Deference to an agency's technical expertise and experience is particularly

warranted with respect to questions involving scientific matters." *United States v. Alpine

Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). Nonetheless, the

"presumption of agency expertise may be rebutted if the decisions, even though based on

scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147

(W.D.Wash. 2000). "Where an agency fails to articulate a rational connection between

the facts found and the choice made, the Court may not supply a reasoned basis for the

agency's action that the agency itself has not given." *Defenders of Wildlife v. Babbitt*,

958 F.Supp. 670, 679 (D.D.C.1997) (internal quotation marks and citations omitted).

Hence, judicial review is "searching and careful," but remains "narrow." A court

should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v.*

*Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993). Overturning agency action is warranted only

if the agency "relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

**B.    NEPA CLAIMS**

> 1.    <u>The Forest Service failed to properly disclose and analyze the effects of the Project on the Caribou Mountain Recommended Wilderness Area</u>.

The Project proposes constructing a motorized trail near the Caribou Mountain

Recommended Wilderness Area ("Recommended Wilderness Area" or "RWA") that

comes within one-half mile of the RWA for about two miles of the trail's length and is

located, in part, on a ridgeline.[4] The Coalition argues that the Forest Service failed to

consider the effects of having an ATV trail so close to a recommended wilderness area,

---

[4] *See* AR 17356 (explaining that the distance from the Wilderness Area varies: "The distance varies. At the top of section 15 it is appx 0.32 mi, and at the widest point toward the bottom of the section is 0.35 mi. Most of the interior of the section is around ¼ mi.") ; AR 17147 (two of the proposed action alternatives will "change the recreational setting within ½ mile of the new motorized trail").

and this failure amounts to an arbitrary and capricious decision that violates NEPA. Pl.'s Mem., p. 7 (Dkt. 24). *See also* 40 C.F.R. § 1508.27(b)(3) (explaining that, in evaluating intensity, the Forest Service should consider "[u]nique characteristics[5] of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas").

Under the Revised Forest Plan ("Forest Plan" or "Plan"), "[n]o new road or motorized trail construction" is allowed, but "[i]mprovements to existing motorized trails are allowed *if they do not lead to long-term adverse changes in wilderness character*." AR 90 (emphasis added). Thus, despite the Forest Plan's stated goal to "[p]rotect and maintain wilderness character," AR 88, it does not contemplate that no motorized activity will occur near the area; just that if it does occur it will not have corresponding long term adverse changes in wilderness character. *See also* AR 88 (explaining that the Recommended Wilderness Area "will be managed to retain its wilderness character until Congress takes action on the recommendation"). Indeed, as the Forest Plan describes, the area already has multiple uses, offering an "excellent opportunity for solitude or a primitive and unconfined type of recreation," although "[v]isitors may encounter mechanized equipment on designated trails during the summer or snowmachine use during the winter." AR 88.

---

[5] Although RWAs are not specifically mentioned in this regulation, any "unique characteristics" should be considered.

The EA states that the proposed alternative (No. 2) will "not affect the quality or quantity of wilderness opportunity available now or into the future," AR 17146, and that none of the trail construction is within the RWA. *See* AR 17095 ("[m]otorized trail construction/ reconstruction associated with this proposal *would not occur within the recommended wilderness prescription* area. Actions associated with all alternatives would not occur within the recommended wilderness prescription area"). However, the Coalition is not comforted by such an assurance, contending that it is not enough for the Forest Service to simply *conclude* there is no effect but rather it must *analyze* in the EA the possible effects of the Project on the RWA, because of the Project's proximity to the RWA.

Although the Forest Service says in the EA – in connection with the proposed alternative (No. 2) – that "[h]aving an additional 7.8 miles of motorized trail will not change the core experience of over 50,000 acres of non-motorized setting," the Service also acknowledges that "it *will change the recreation setting and experience within ½ mile of the trail*." AR 17146 (emphasis added). *Compare* AR 17145 ("The existing landscape character of the area will not change under all alternatives. The addition of a motorized trail could change the natural setting of the landscape within 1/4 mile[6] of the route; however, trails generally do not lower an area's scenic integrity if they are

---

[6] The EA thus refers both to the ATV trail's potential to change the "recreation setting and experience" within 1/2 mile of the trail and also possibly changing the "natural setting of the landscape" within 1/4 mile of the trail.

designed to follow existing terrain and do not create a straight corridor through continuous vegetative cover"). Thus, the Forest Service appropriately recognizes that some changes will occur to areas within 1/2 mile of the trial, although changes to the "natural setting" may occur within a smaller area, *i.e.*, within 1/4 mile of the trail.

The EA also describes likely increased use of the area with the proposed alternative because "[b]uilding motorized and non-motorized trails is likely to increase recreation use of the area during spring and summer", and "potentially during hunting season." AR 17146. *See also* AR 17123 (noting with Alternative Three that "[p]eople will continue to use motorized trails in the Caribou Mountain area, with potentially more use attracted by the new trail and loop opportunities"). On the other hand, the EA also explains that: "constructed recreation trails do not have the same dimensions and do not involve the same degree of disturbance as constructed roads. Trails can be reclaimed." AR 17147. *See also* AR 11718 ("All alternatives do not represent an irreversible and irretrievable commitment of resources concerning wilderness potential and roadless area values, including the values of semi-primitive recreation, reference landscapes and scenic integrity."). *Id.*

In considering the cumulative effects of Alternative Two, the Forest Service decided in the EA that "[a]dditional recreation trail use and miles of trail will not change the existing wilderness potential or the roadless area values of Caribou City Roadless Area." AR 17146. Additionally, the Forest Service stated that the cumulative effects of Alternative Two "will be similar to the effects described for Alternative One", the no

action alternative. *Id.* Specifically, the proposed alternative (No. 2) "would not change the quality or quantity of roadless values offered by these lands. Considering Idaho's Designated Wilderness System, this alternative would not affect the quality or quantity of wilderness opportunity available now or into the future." *Id.*

The Coalition criticizes these portions of the EA on the same basis, *i.e.*, that such statements represent bare conclusions, lacking the required "because" or analysis part of the consideration. In particular, the Coalition argues that the Forest Service should have considered the noise impact[7] of the ATVs and possible off trail use of ATVs.[8]

Significant to this issue, the parties disagree as to whether the trial traverses a ridgeline *overlooking* the RWA and what that precise location of the trial means for the alleged sight and sound impacts in this case. *See* AR 17219 (map that the Coalition

---

[7] *See, e.g., Izaak Walton League of America v. Kimbell*, 516 F. Supp. 2d 982, 995–97 (D. Minn. 2007) (finding that the agency violated NEPA because it failed to address the impacts of snowmobile sounds entering the Wilderness area from a trail "immediately adjacent"); *Greater Yellowstone Coalition v. Timchak*, No. CV–06–04–E–BLW, 2006 WL 3386731 (D.Idaho Nov. 21, 2006) (discussing the noise impact from helicopters in a designated wilderness area). These holdings illustrate that noise can have an impact on wilderness characteristics. The other case relied on by the Coalition, *Montana Wilderness Association v. McAllister*, 666 F.3d 549 (9th Cir. 2011), is less germane, however, because it involved an area designated for potential inclusion through a Wilderness Study Act that contained specific requirements not applicable here, such as maintaining the wilderness characteristics of the area as they existed in 1977.

[8] In the Decision Notice, the Forest Service considered the potential that ATVs could ride off the trail into the RWA and gave this as a reason for not adopting Alternative Three. AR 17197 ("Having the trail closer to the recommended wilderness area could negatively affect the potential wilderness experience due to potential illegal ATV use leaving the trail and riding into the non-motorized recommended wilderness.").

submits shows the trail traverses a ridgeline that overlooks the RWA); AR 14319 (map); AR 17417–18 (pictures of "ridgeline" portion of trail); AR 17416 (photo of ridgeline with tag: "On ridgeline in Section 10, the proposed ATV trail location. July 2010.").  The Coalition argues that the sights and sounds would be "obvious" because the trail traverses "the *upper reaches* of Caribou Mountain," Pl.'s Mem., p. 10 (Dkt. 24) (emphasis added), and the Forest Service counters that "the sights and sounds would not be visible or audible" because the trail is "located approximately one-half vertical miles *from the top* of Caribou Mountain," Def.'s Mem., p. 7 n. 5 (Dkt. 35) (emphasis added).  However, the Court is not in a position to resolve any dispute as to whether ATVs can be seen from the RWA on the upper reaches of Caribou Mountain, or if they are hidden from view (and their noise sheltered from being heard), because they are not on the top of Caribou Mountain, because the EA did not address sight and sound impacts on the RWA in the first instance and the agency record, the EA in particular, does not clearly state whether ATVs on the proposed trial could be seen or heard from the RWA.  Accordingly, the positions the parties take in this litigation as to whether ATVs could be seen and heard from the RWA are both based on bare conclusions, without any supporting evidence of record, other than the trail's location in relation to the RWA at certain points (within 1/2 mile).  This lack of comment in the agency record as to any sight and sound impacts underscores the Coalition's position that the Forest Service did not consider these potential impacts to the RWA and its wilderness characteristics, particularly when the EA acknowledges that the trial will have a potential impact within 1/2 mile area around it.

**ORDER - 14**

On the other hand, the Coalition's position that the Forest Service completely ignored the RWA issue is not entirely accurate. The Forest Service completed a Wilderness Potential and Roadless Area Values Specialist's Report, which analyzes the Project's impacts to the Caribou City Inventoried Roadless Area (the "IRA"). AR 11708. This Report discusses in general "wilderness characteristics" of the entire IRA, and notes that the Recommended Wilderness Area is in the "eastern portion" of the IRA. *See* AR 11710 ("The Plan manages the eastern portion of the Caribou City Roadless Area as 1.3(e) Recommended Wilderness . . .."); AR 11713 ("The eastern portion of the [Caribou City IRA] was recommended for wilderness designation, as part of the 2003 Forest planning process."). Thus, the Report considers some impacts to the Recommended Wilderness Area, albeit not by mentioning the impacts, such as from sight and sound, directly. *See* AR 11714 ("Existing high natural integrity and apparent naturalness of the eastern portion of the roadless area will be retained."); AR 11716 ("Having an additional 7.8 miles of motorized trail will not change the core experience of over 50,000 acres of non-motorized setting . . ."); AR 11710 ("Forest Plan prescriptions . . . do not allow snow-free season motorized travel within the Recommended Wilderness prescription.").

However, even though the Report does discuss that there are low standard roads in the area of the RWA, there is no mention that the Forest Service examined or even noted any noise impacts from those roads, AR 11719. Not surprisingly then, the Forest Service's attempt to rely on the Report for this purpose is unavailing. *See* Def.'s Reply, p. 2 (Dkt. 40). The Report also does not evidence any discussion of potential noise

impacts from the proposed trail or state that there will be no impacts from noise or off-trail[9] ATV use.  Thus, although the Forest Service did consider some other potential impacts to the RWA in the studies contained in the record, it did not analyze the potential sight and sound impacts of the Project, nor does the EA recognize a potential impact on the RWA (because the trail was not located *in* the RWA[10]).  Instead, the EA contains mostly conclusory statements.  Even coupled with the supporting studies and other documents in the record about the area retaining its potential for wilderness designation, there is a void in the EA with respect to the analysis and details supporting the conclusions that there will be no harmful impacts to the RWA from the trail.  *See Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*, 6625 F.3d 10922, 1120-21 (9th Cir. 2008).  In other words, there are tools and perhaps all of the tools needed to do the work, but (at least insofar as the EA describes), the work was never completed.

---

[9]  The EA and Decision Notice discuss the potential for illegal ATV use in the RWA in relation to Alternative Three.  However, even though the proposed alternative (No. 2) is still very close to the RWA, the documents are silent about the potential for illegal ATV use into the RWA in connection with that alternative.  *See* AR 17197 (explaining that adopting alternative three and having "the trail closer to the recommended wilderness area could negatively affect the potential wilderness experience due to potential illegal ATV use leaving the trail and riding into the non-motorized recommended wilderness").

[10]  The Forest Service argues that "because the motorized trail does not occur in the RWA, the Forest Service correctly found that it does not impact the eligibility of the RWA for Wilderness designation under the Wilderness Act."  Def.'s Mem., p. 7 (Dkt. 35 (citing AR 17304).  *See also* AR 2798 ("The proposed Action could affect the wilderness characteristics of the Caribou Recommended Wilderness Rx Area. This concern will not be considered further, as the Proposed Action lies outside of this Rx Area.").

Additionally, the record has no explanation as to why the wilderness characteristic of solitude should be preserved only at the core of the Recommended Wilderness Area. *See* AR 11710-15 (the Wilderness Values Report considers there will be some impact, but that the core retains a high opportunity for solitude and remoteness and the existing natural integrity and apparent naturalness will remain high).[11]  The Court fully understands that the nature of boundary drawing means that some activities may be appropriate on one side of the line and not on the other.  However, if the wilderness characteristics are protected simply by assuming that the "core" of any recommended wilderness will continue to have true wilderness values even though the outer edges of the wilderness area may not (or may be further reduced than is already the status quo), then the agency may be creating a *de facto* reduced proposed wilderness within (and inconsistent with) the boundaries of what it has previously identified as a larger recommended wilderness area.

In summary, the Forest Service failed to comply with NEPA, and acted in an arbitrary and capricious manner, when it did not consider indirect impacts to the RWA from having a trail within 1/2 mile of the boundary, particularly considering that the

---

[11]  *See* AR 11714 ("The no action and action alternatives will not change the existing wilderness characteristics of the Caribou City Roadless Area.  Existing high natural integrity and apparent naturalness of the eastern portion of the roadless area will be retained.  The lower values of the western portion of the roadless area will not be affected by the addition of a motorized trail.  The opportunity for solitude will remain high on the eastern portion of the area, and remain moderate on the western portion of the area.").

**ORDER - 17**

Forest Service noted changes may be felt to the recreational setting within 1/2 mile of the trail, and that building the trail may bring increased use, but did not consider or rule out possible noise impacts on the RWA or possible impacts from illegal ATV use in connection with the proposed alternative. However, it is possible (depending upon the results of such a step) that this question can remedied in an updated EA, without the need for the Forest Service to prepare an EIS, as discussed in more detail at Section B(4), *infra*. The Court is not prescribing here a precise formula, because that is a proper decision for the Forest Service to draw in the first instance. The Court does, however, hold that on this record the Forest Service's consideration of the potential impacts to the RWA in this instance did not rise to the level of the requisite "hard look" at the environmental consequences of pursuing the proposed alternative.

      2.    <u>The Forest Service complied with NEPA in considering the soil issues and final location of the trail.</u>

The EA describes the proposed trail's "[t]wo main risk factors for mass instability" as "evidence of past slumps and steep slopes on unstable landforms." AR 17119. It goes on to explain that, "[w]here these risk-factors for mass instability were identified during field sampling and analysis, *additional* site-specific field work to locate new trail will be needed to ensure project compatibility with long-term soil resource goals." *Id.* (emphasis added). The Coalition argues that the Forest Service thus improperly deferred analysis of

the location of the as yet undetermined 0.5 mile section of the trail until after it approved the Project.[12]

The Forest Service argues that the trail corridor was identified in the EA and the area's stability was analyzed; thus, an EIS was not required. Def.'s Mem., p. 9 (Dkt. 32). The Forest Service noted a Soil Specialist Report prepared for the Project, which identifies concerns with reconstructing the trail in Section 10 due to "mass failure hazards of building road on steep slopes," and argues it considered several soil resource factors to determine the suitability for the trail location. Def.'s Mem., p. 9 (Dkt. 32) (quoting and citing AR 8287–90; 16260) (internal quotation marks omitted). *See also* AR 8289 ("Several studies in the ldaho Batholith show the erosion and mass failure hazards of building a road on steep slopes . . . . These concerns are valid for the 0.5 mile of existing roadbed that is proposed for reconstruction to function as a motorized trail.").

The Forest Service acknowledged the risk factors, but also documented that stable landforms can be found in the area of concern (primarily in Section 10). *See* AR 8289 (recognizing concerns with reconstructing the trail in Section 10 due to "mass failure hazards of building a road on steep slopes"); AR 8287 (stating that although "soils in this

---

[12]    In support, the Coalition notes that the Project crosses steep and unstable soils and one of the most problematic areas is in the area where the last 0.5 miles of trail is located. *See* AR 014319 (noting that "soil stability" within the Project area is one reason warranting "disclosure of effects" in an EIS); AR 11638, 11620 (2008 draft Environmental Assessment stating: "Several studies in the Idaho Batholith show the erosion and mass failure hazards of building a road on steep slopes (exceeding 45-70%). These concerns are valid for the 0.64 miles of exploration road that is proposed to function as a motorized trail.").

**ORDER - 19**

area are mapped primarily as unstable or marginally unstable . . . stable landforms can be found, for example rocky ridgelines"); AR 16261 (stable landforms can be found). It also proposed alternatives to account for the soil issue, such as using stable landforms like rocky ridgelines and re-contoured roadbeds. *See id.*; *see also* AR 17119–22 (stating that the proposed motorized trail in the proposed action "may utilize a re-contoured roadbed to traverse a portion of the steep east face of Caribou Mountain").

Additionally, the Forest Service ground-checked segments of the trail and performed sufficient field sampling and analysis. *See, e.g.*, AR 14039 (indicating soil conditions in plot 1 in section 10 –misidentified as section 15[13]– were evaluated); AR 14035–38 (soil evaluation notes from plot 1 in section 10).[14] For example, the EA relies on a 2008 Soil Specialist Report, in which the Forest Service considered the soils and their suitability for the proposed trail. AR 8287. That Report explains "Alternative 2 route uses less-steep landforms, which have been **ground-checked for stability**." AR 8287 (emphasis added). *See also* AR16260 (2011 Addendum to Soils Specialist Report stating: "A sample of the trail segments proposed on landtypes identified as unstable or marginally unstable in the Caribou Soil Survey were **ground verified as part of this analysis** to determine capability.") (emphasis added); AR 14039 (noting locations of

---

[13] *See* Def.'s Reply, p. 4, n. 3 (Dkt. 40) (explaining the misidentification of section 10).

[14] *See also* AR 16260 ("A sample of the trail segments proposed on landtypes identified as unstable or marginally unstable . . . were ground verified . . . to determine capability.").

2007 soil field observation, including a site in Section 10). Thus, the Forest Service appropriately and sufficiently analyzed the area in which the 0.5 mile section of trail would be built. In sum, the Forest Service, at various times, acknowledged the potential hazards and proposed using less-steep landforms and trail placement to avoid unstable areas. *See* AR 8287, 8290, 17122. The Forest Service also identified in the EA the need for additional site-specific field work as a mitigation measure for all alternatives, not just the proposed alternatives. AR 17120 ("Where field sampling and analysis identified risk-factors for mass instability such as steep slopes and potentially unstable landforms, additional site-specific field work to locate new trail will be needed to ensure project compatibility with long-term soil resource goals.").

Although the Forest Service issued its Decision Notice approving the Project before precisely identifying the final location for a 0.5 mile section of the trail, AR 17192, its action in doing so complies with the Forest Plan's standard requiring that "[l]andtypes identified as being unstable or marginally unstable in the Caribou National Forest Soil Resource Inventory *shall be ground verified* prior to soil disturbing activities to determine the capability of the land to sustain resource development activities including road construction."[15] AR 32 (emphasis added). Additionally, on appeal from that Decision Notice, the Forest Service's Appeal Deciding Officer acknowledged that "there remains

---

[15] AR 17119 ("Where these risk-factors for mass instability were identified during field sampling and analysis, additional site-specific field work to locate new trail will be needed to ensure project compatibility with long-term soil resource goals.").

approximately 0.5 miles of trail that requires *additional* site-specific field work across areas with potentially unstable soils to determine the [trail's] final location," but directed the "District Ranger to not proceed with ground disturbing activities covered under the DN/FONSI until the final location of this trail is identified and laid out on the ground." AR 17288 (emphasis added). He further recommended an interdisciplinary team sufficiency review of the final location to determine whether it changes the effects disclosed for Alternative Two in the Updated Final EA. *Id.*

Thereafter, the Forest Service field-verified the 0.5 miles of trail and prepared a supplemental information report ("SIR"). The Coalition argues that the SIR may not be used to present information or analysis that the Forest Service was required to include in original NEPA documents. Pl.'s Mem., p. 9 (Dkt. 24) (citing *Idaho Sporting Cong, Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)). "[C]ourts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000).[16]

The Court is not so persuaded. Here, the Forest Service was within its discretionary bounds in finding that the SIR did not require a supplemental EA. As the Forest Service sensibly explains, the field verification of the 0.5 miles of trail in Section

---

[16] "[O]nce an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Idaho Sporting Congress*, 222 F.3d at 566.

10 was not done "to rectify any failures to do analyses that could have been done earlier,"
but rather was added to "confirm that the effects analysis in the [EA] had correctly
characterized the proposed trail as avoiding areas with unstable soils." Def.'s Mem., p.
10 (Dkt. 32) (citing AR 17288).[17] This ground inspection and the SIR confirmed that "the
current range of effects is within the scope of the effects disclosed in the previous
analyses". AR 17331; *see also* AR 17334. *Cf. Price Road Neighborhood Ass'n, Inc. v.
U.S. Dept. of Transp.*, 113 F.3d 1505, 1508–09 (9th Cir. 1997) (explaining that a
supplemental EA is required "if the environmental impacts resulting from the design
change are significant or uncertain, as compared with the original design's impacts").
Here, the Forest Service discussed in the EA and supporting documents the soil issues
and how to potentially resolve them. Final location of a small part of the trail, once the
Project was approved, simply required additional field verification to ensure the trail
would be located on stable landforms, while avoiding unstable soils in the area, in
compliance with the Forest Plan's requirements.

Because the EA disclosed issues with the soil and proposed methods for building
the trail on more stable landforms and mitigating issues, and the SIR and ground
verification confirmed this could be done, there was no change in the environmental
impacts that otherwise would have required disclosure in another EA. In short, because

---

[17] *Idaho Sporting Congress*, 222 F.3d at 568 (the SIRs "were prepared in response
to litigation, years after the original decisions to approve the timber sales were made").
The EA here contemplated that "additional site-specific work to locate new trail will be
needed to ensure project compatibility with long-term soil resource goals." AR 17119.

the determination of the final location of the 0.5 miles of trail at issue would not change

the nature of the effects already disclosed, full project implementation could proceed

without another EA.  Hence, the Forest Service's decision that there would not be

significant environmental impacts for that portion of the trail complied with NEPA.

      3.      <u>The Forest Service adequately addressed the sedimentation effects of the Project on Yellowstone Cutthroat Trout</u>.

The Coalition argues that the Forest Service did not disclose the direct, indirect, and

cumulative effects on Yellowstone Cutthroat Trout ("Cutthroat") of its proposed action.

The Coalition contends that waterways throughout the Project area already have an

overabundance of sediment that limits the ability of the Cutthroat to persist.  Pl.'s Mem., p.

10 (Dkt. 24).  It argues that the Forest Service did not consider the amount of sediment

expected to result from the construction, reconstruction, and use of the trail, in violation of

NEPA.

The Forest Service responds that the Coalition "mischaracterizes the streams in the

Project Area [as] 'impaired by an overabundance of sediment,' unable to support robust

Cutthroat populations."  Def.'s Mem., p. 12 (Dkt. 35) (citing Pl.'s Mem., p. 10).  Although

three streams in the Project area – Iowa, North Fork Eagle, and Tincup Creeks – are listed

as "water quality" impaired, AR 16256, the Forest Service points out that the Idaho

Department of Environmental Quality has identified only Tincup Creek as a stream being

impaired by an overabundance of sediment, and the Forest Plan classifies all streams in the

Project area as supporting fisheries populations that are "present, strong."  *Id.  See* SAR

20372–73 (cause of impairment of Iowa Creek "unknown"); AR 602–03 (summarizing Forest-wide species status of Cutthroat trout).

The Forest Service also points to its qualitative analysis of the comparison of the impacts of each proposed alternative. Def.'s Mem., p. 11 (Dkt. 32).[18] For motorized trails upland of streams, it "determined that the Project only occupies about 0.0001 percent of the analysis area, and thus concluded that the Project was too small to have an effect at the watershed scale." *Id.*, p. 12 (citing AR 14323); *see also* AR 17131. The Forest Service then compared the relative impacts of alternatives, considering the number of miles of motorized trails in Aquatic Influence Zone and the number of motorized stream crossings, to evaluate the relative risk of erosion and sediment delivery. AR 14323–24; AR 14330–33. The Forest Service determined that the proposed alternative would increase motorized trail mileage in the AIZ by 0.9 miles, then compared each alternative and determined that the overall impacts of the proposed alternative would be greater than the non-motorized alternative (Alternative Four), but less than Alternative Three, which has more miles by streams that occur in more sensitive soils. AR 14333. *See also* AR14332 (considering, in connection with Alternative Two, that there would be a net decrease of four stream crossings, but that would be combined with the proposed replacement of all primitive stream crossings with bridges).

---

[18] The EA evaluated project alternatives "for the expected benefit and indicators on a comparative basis". AR 2884. This analysis considered each alternative in terms of the miles of motorized trails in Aquatic Influence Zones ("AIZs"), or areas adjacent to streams), and the number of streams crossings. *Id.*

The Coalition argues that the Forest Service was required to explain and consider more precisely how much sediment the proposed alternative would contribute to Bilk, Iowa, North Fork Eagle, and Tincup Creeks from new trail construction, trail decommissioning, and ATV use. According to the Coalition, a measure of "greater" or "less" impact is not sufficient. Pl.'s Reply, p. 7 (Dkt. 37) (citing *League of Wilderness Defenders-Blue Mts. Biodiversity Project v. Allen*, 615 F.3d 1122, 1144-45 (9th Cir. 2010) ("'greater' is a relative term that requires comparison. Without quantifying actual risk a comparison is not possible")).

In the Court's review, however, it is evidence that the Forest Service did quantify the risk by explaining how bridge crossings and certain soils impact steams and describing how it selected among the alternatives and what mitigation measures would lessen any impact from the proposed alternative. On such decisions, the Court must give the "highest deference" to the Forest Service's "technical analyses and judgments within its area of expertise." *League of Wilderness Defenders*, 615 F.3d at 1131. Here, the Court finds that the Forest Service's analysis of sedimentation and its impacts on trout is sufficiently grounded in its area of expertise to call for this deference. *See also Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1185 (9th Cir. 2000) (in evaluating environmental impacts, agencies are entitled to select their own methodology).

Buttressing that conclusion, the Project analysis used the same geographic scale for its water quality analysis as the 2005 Caribou Travel Plan Final EIS ("Travel Plan")—the

HUC-5 watershed.  *See* AR 14321–22, AR 17125; AR 2100.  This relatively large area[19]

was chosen because the hydrologic analyses for the existing conditions in the travel plan

revision FEIS (upon which this Project analysis relies) used the same analysis units.  AR

14321.  The Forest Service submits that analysis "at the watershed scale also makes sense

because motorized trails create areas of 'hydrologic disturbance' that can change runoff

characteristics of watersheds, particularly where roads cover more than 2.5 percent of the

watershed area."  AR 1798–99; *see also* AR 2105.  Using the watershed scale also follows

the guidelines established in the Forest Plan for protecting watershed and riparian

resources.  AR 42.  This analysis is entitled to deference.[20]

    The Forest Service also explained that, even with some short-term impacts caused

by construction, the proposed Project would provide "long term benefit . . . as poorly

engineered old decommissioned segments and closed stream crossings heal."[21]  AR 14334.

---

[19] Even though a large area was considered, the Fisheries Report analyzes site-specific impacts to "potentially affected streams," AR 11700–01, considering impacts to riparian condition indicators for trout habitat (*i.e.*, stream shading and temperature, large woody debris, and bank stability) at the stream scale, AR 14604–06.  *See also* AR 14323–24, 14330–33.

[20] The Forest Service appropriately submits that "any increase in sediment would be too small to measure" and "attempting to quantify the immeasurable [makes] no sense."  Def.'s Reply, p. 13 (Dkt. 40).  There is a 2.5% threshold for when activities would be expected to produce additional sediment at the watershed scale.  SAR 17799 (study on erosion finding that percentage of sediment in spawning gravels increased above natural levels when more than 2.5% of a basin area is covered by roads).

[21] The Biological Assessment, as well, examined the effects of the Project on landslide risk, stream shading, stream temperature, large woody debris, bank stability, deep rooted vegetation, and its cumulative effects, and found that the proposed Project would provide an overall benefit to watershed conditions and fish habitat.  AR 14602–07.

Such an end is a stated objective of the Project, *i.e.* "to identify and correct sources of

sedimentation and erosion caused by poorly designed motorized travel routes within the

project area." AR 17085.

In other words, the Project is intended by the Forest Service to update and relocate

portions of the trail to remedy and avoid sedimentation problems. *See* AR 17127

(describing the *existing* trail damage and issues to include that "ATV traffic on native

surfaced trails occurring on finer grained soils tend to form distinct cupped tracks which

interfere with drainage design features"). For example, the record reflects a recognition by

the Forest Service that "[s]ediment delivery is influenced by the proximity of trails to

stream channels," and "a 100 ft. protective width [is advocated] to maintain water quality

of adjacent streams." AR 17128. "Moving trail segments farther from streams is likely to

benefit water quality, stability and biologic diversity by reducing sediment delivery to

---

Similar benefits were described by the Trail Fisheries Report, which described that:
> Each of the action alternatives would benefit aquatic habitat
> in North Fork Eagle Creek (where the trail would be relocated
> away from the stream) and Barnes Creek (where the road will
> be improved) because they would decrease sediment delivery
> to the stream. In addition, each action alternative would
> improve stream crossings at Iowa Creek (bridge abutment
> scouring), Miners Delight (undersized and perched culvert),
> Camp (undersized and perched culvert), Bilk (sediment
> source ford), and McCoy (perched and undersized culvert
> near guard station) creeks. The intent of these projects is to
> improve stream function and aquatic habitat. These
> improvements would likely fully mitigate for impacts
> associated with each of the action alternatives.

AR 11704.

**ORDER - 28**

streams and wetlands."[22]  AR 17128; *see also* AR 2103.  Moreover, for construction and

use of motorized trails located near streams, and with stream crossings, the Forest Service

described the mitigation measures and best management practices.  AR 17126–29; AR

14329, AR 14332.  Such an analysis is appropriate and consistent with NEPA

responsibilities, and entitled to deference.  *See Hapner v. Tidwell*, 621 F.3d 1239, 1246

(9th Cir. 2010) (explaining that an agency in certain circumstances may rely on mitigation

measures that minimize impacts from the project).

For all of these reasons, the Forest Service has adequately explained its chosen

methodology and the conclusions it has drawn, *see McNair*, 537 F.3d at 993–94, and the

Forest Service's decision is not arbitrary or capricious.

4.    The Forest Service was not required to prepare an environmental impact statement for the Project.

The Coalition argues that several things necessitated an EIS for this Project,

including the potential adverse impact to soil, water quality and fisheries, the unique

geographic characteristics of the Recommended Wilderness Area, the uncertainty about

the potential impacts of the proposed action (that could be resolved by further collection of

data) and a threatened violation of a forest plan standard under NFMA – specifically the

---

[22]  The proposed alternative relocates some portions of the existing Winschell Dugway and North Fork Eagle Creek trails out of AIZs, and use bridges rather than native-surface stream crossings.  *See* AR 2884, 2887, 14326, 14328–29; 14333– 35; 16253–59.

standards for soils and fisheries.  The Forest Service disagrees and relies on its arguments in response to subsections B1, B2, and B3 for support.

NEPA allows an agency to first do a threshold examination – in the form of an environmental assessment – to determine "whether to prepare an [EIS] or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  As a result of this decision, the Forest Service is required to update the EA to include consideration of potential impacts to the RWA.  Hence, it is possible, but not a part of this decision, that an EIS may be conducted, but the Forest Service appropriately may first consider and analyze the issue in a supplemental EA.

Otherwise, the record demonstrates that the Forest Service adequately analyzed the Project's impacts to soils, water quality, and Yellowstone Cutthroat Trout and, as to those issues, reasonably found that any impacts will not be significant and an EIS was not required under NEPA.  In addition, as explained in more detail below, the Project is consistent with the Caribou Forest Plan standards and objectives, and thus complies with NFMA.

## C.   NFMA CLAIMS

NFMA claims focus on whether the Forest Service has managed the lands at issue in accordance with the Forest Plan.  16 U.S.C. § 1604(i).  The Coalition contends that, as to the Project, that has not been done.

1.      Forest Plan Objectives, Standards, Guidelines, and Goals.

Because the Coalition's arguments rely, in part, on whether the Forest Service has complied with the Revised Forest Plan, the Court will briefly describe here some of the terms used in the plan.  Every Forest Plan must include the following:

(1)     Objectives.  "An objective is a *concise, measurable, and time-specific statement* of a desired rate of progress toward a desired condition or conditions.  Objectives should be based on reasonably foreseeable budgets." 36 CFR § 219.17(1) (emphasis added).

(2)     Standards.  "A standard is a *mandatory constraint* on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements."  *Id.* (emphasis added).

(3)     Guidelines.  "A guideline is a constraint on project and activity decisionmaking that *allows for departure* from its terms, so long as the purpose of the guideline is met.  (§ 219.15(d)(3)).  Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements."  *Id.* (emphasis added).

(4)     Goals:  A Forest Plan also *may* include goals as plan components.  "Goals are *broad statements of intent*, other than desired conditions, usually related

to process or interaction with the public.  Goals are expressed in broad,

general terms, but do not include completion dates."

36 CFR § 219.17(2) (emphasis added).

    2.    <u>The Forest Service Complied with the Revised Forest Plan Standards and Guidelines for the Protection of soils</u>.

The Coalition argues that the Project fails NFMA because the Forest Service did

not comply with certain Standards and Guidelines from the Caribou Revised Forest Plan

("Forest Plan") regarding the protection of soils, namely, that: (1) land types identified as

being unstable or marginally unstable in the Caribou National Forest Soil Resource

Inventory must be ground verified prior to soil disturbing activities to determine the

capability of the land to sustain resource development activities including road

construction, AR 32; (2) on land types where landslides or landslide prone areas have been

identified, a site specific analysis shall be conducted to ensure project implementation is

compatible with desired future conditions, AR 32; (3) resource developments and

utilization should be restricted to lands identified in the Soil Resource Inventory as being

capable of sustaining such impacts, AR 33; and (4) road construction on unstable and

highly erosive soils should be avoided, AR 63.

The Forest Service responds that it complied with NFMA to manage the forest for

multiple uses and that, in designing and approving the Project, it properly concluded that

in "the long-run, the Project will be environmentally beneficial because it will

decommission existing trails, limit unauthorized use, establish proper stream crossings,

**ORDER - 32**

and apply environmental mitigation during new trail construction." Def.'s Mem., p. 16 (Dkt. 32).

<em>(i)     The Project is a Trail and Not a Road</em>

The Coalition argues that the Forest Plan requires the Forest Service to "[a]void road construction on unstable and highly erosive soils." Pl's Mem., p. 19 (Dkt. 24) (citing AR 63). This is an accurate description of the guideline, but the Forest Service is also correct that (a) the guideline does not apply to a trail of less than 50 inches in width (applicable for most of the trail) and (b) the Code of Federal Regulations defines a road as a "motor vehicle route over 50 inches wide, *unless identified and managed as a trail*," and concomitantly defines a trail as "[a] route 50 inches or less in width or a route over 50 inches wide that is *identified and managed as a trail*." 36 C.F.R. § 212.1 (emphases added). *See also* Def.'s Mem., p. 17.[23] The trail at issue here is over 50 inches wide in some places, but mostly is between 48 and 60 inches and, regardless, it is identified as and will be managed as a trail. *See* Def.'s Mem., p. 17, n. 18 (Dkt. 32) (citing AR 16954–55; AR 16910; AR 17101; Forest Service Handbook § 2309.18, Chapter 20).

The Coalition argues that the Court should not consider this regulation because the Forest Service only draws upon the regulation in the litigation stage of the process, not during the administrative process. Pl.'s Reply, p. 11 (Dkt. 37). The Forest Service did reference (in a document titled: "Project Compliance With Forest Plan Standards and

---

[23] Defendant's Memorandum has a scrivener's error in its citation to 35 C.F.R. § 212.1, but correctly recites the contents of 36 C.F.R. § 212.1.

Guidelines") the guideline to avoid road construction on unstable slopes and highly erosive soils, but in doing so noted that there is "[n]o road construction associated with [the] project", and "trails" are discussed elsewhere. AR 16980. Additionally, although the EA does discuss roads, that discussion appears in the context of general planning and management, and the Project involves building a *trail* where no trail or road previously existed, or reconstructing old or degraded roads to current trail standards. *See, e.g.*, AR 17118; 17120; 17122–23.

Moreover, the Forest Service contends that the trail is routed on stable landforms and sufficient soil analyses were conducted to justify its decision. Def.'s Mem., pp. 17-18. The record supports the Forest Service's position. Even if the road construction guideline somehow did apply to the proposed motorized trail, the Project would not violate the guideline because the Forest Service is routing the trail on stable landforms—not "unstable slopes and highly erosive soils." In a 2008 Soils Specialist Report, the Forest Service's soil scientist explained that the route uses (1) "less-steep landforms, which have been ground checked for stability" to gain elevation, (2) "existing road prisms" to traverse a steep portion of the Project area, (3) a rocky ridgeline that provides a "stable location for the trail", and (4) a portion of the old original Winschell Dugway that "is in good condition." AR 8290; *see also* AR 16261 (explaining that where unstable landtypes were identified on the trail route, they were ground-verified to ensure compatibility); discussion at section B(3) *supra* and at section C(1)(ii) *infra*.

The Coalition cites two standards[24] and one guideline[25] directing the Forest Service

to use caution when developing projects on soils that are unstable or prone to landslides to

argue that the Forest Service's soils analysis violated NFMA.  Pl.'s Mem., p.17 (citing AR

32).  In support of its position, the Coalition points to the 1990 Soil Survey of the Caribou

National Forest, which limits road construction, reconstruction, and use on certain soil

types that the Coalition argues is the same type of soil on which the Project trail is located.

Pl's Mem., p. 19 (Dkt. 24); *see also* AR 16263–16556 (Soil Survey).

The Forest Service does not dispute that the types of soil highlighted by the

Coalition are present in the Project area.  There is agreement that certain standards and

guidelines apply because the Soil Resource Inventory describes some – but not all – of the

landforms in the Project area as marginally unstable or unstable.  *See* AR 17117–18.

However, even though certain standards and guidelines apply that require "ground

---

[24] "Landtypes identified as being unstable or marginally unstable in the Caribou
National Forest Soil Resource Inventory shall be ground verified prior to soil disturbing
activities to determine the capability of the land to sustain resource development activities
including road construction."  AR 32, Standard No. 1.  "On landtypes where landslides or
landslide prone areas have been identified, a site-specific analysis shall be conducted to
ensure project implementation is compatible with desired future conditions."  *Id.*,
Standard No. 2.

[25] "Resource developments and utilization should be restricted to lands identified
in the Soil Resource Inventory as being capable of sustaining such impacts."  AR 32.
Although guidelines are constraints on projects and activity decisionmaking, they allow
for departure from its terms, as long as the purpose of the guideline is still met.

verification" and "site-specific analysis," development of trails in areas with soil stability concerns is not universally prohibited.[26]

In this regard, the Coalition agrees that the Forest Plan requires field validation of projects of this type when sensitive soils are at issue. However, the Coalition contends that insufficient studies were made, arguing that eight test pits, only five of which are on or adjacent to the proposed project, are not representative of the scope and magnitude of the proposed project. Pl's Mem., p. 21 (Dkt. 24). The Forest Service disagrees, and relies upon the fact that it has "discretion to determine the physical scope used for measuring environmental impacts" so long as its "choice of analysis scale . . . represent[s] a reasoned decision." *Idaho Sporting Cong.*, 305 F.3d at 973.

For the reasons explained below, even if the Forest Service only analyzed eight test pits, its decision is neither arbitrary nor capricious. Additionally, the landform and soil observations from those eight test pits were sufficient, along with other evidence in the record, to conclude that the proposed trail will be consistent with Forest Plan guidance. AR 8283–94; AR 16260–61; *see McNair*, 537 F.3d at 995 ("To determine whether deference is warranted, [courts] look to the sufficiency of the evidence, not the size of the record.").

The Coalition acknowledges that the Forest Service did some field work related to the trail as required by the Forest Plan, but argues that there is little evidence that the

_____

[26] However, *road* construction may be *limited*. *See, e.g.*, AR 16366, 16373, 16565, 16469.

project area generally, and trail in particular, is capable of sustaining road construction, reconstruction, and motorized use activities.  Pl's Mem., p. 20 (Dkt. 24) (citing AR 32, 14040–71).  On one such prong, the Coalition avers that "no portion of the North Fork Eagle Creek Trail reroute was visited."  Pl.'s Mem., p. 20.  However, there is reference in the record of visits to that area at some point during the trail project's lengthy development.  *See* AR 14474 (describing under a heading "Eagle Creek notes and dates - 2010" that there exist "field notes for several days of work on the N. Fk. Eagle Trail in 2010" and noting that this "trail relocation is part of the . . . project," and that grant funds were used "to accomplish [maintenance] on the existing trail" and a preliminary new relocation of about one mile, with one bridge, maybe Two, was mapped out").  And, as described above, the Forest Service's record of field work and analysis is more than only a "little evidence."  On review, it shows thoughtful consideration and analysis of several issues related to soil stability and other issues.  The record includes the Forest Service's threshold consideration of soil descriptions and landform notes from the Project area that were collected in the late 1970s and early 1980s, before the Project details were formed.  AR 836–87.  The Forest Service then analyzed the specific route for the motorized trail by having a soil scientist travel the route, collecting soil and landform notes, and making on-the-ground observations.  *See* AR 14035–71; AR 17873-85; 17334–41; AR 16260; AR 16996–97.  One soil scientist concluded that the proposed route "would provide a motorized trail located on more stable landforms, such as ridgelines and existing stable road prisms[, although a] few segments of the trail will need to traverse stable but steep

mountain slopes."  AR 16262.  The Forest Service also examined other motorized trails

near the Project area that go over steep landforms and cross similar terrain and soil, to

consider whether there was significant erosion or mass instability.  AR 8292, AR 8399.

The Forest Service also explained that it designed the route to comply with trail design

parameters and to take advantage of stable landforms, to help minimize erosion and

landslide concerns.  AR 8290.

These actions involving the collection of relevant information and scrutinizing the

same by the Forest Service demonstrate that the Project satisfies the Forest Plan's

standards and guidelines.  *See* AR16261 ("All alternatives, modified by the mitigation

measures [included in the Project] meet [Forest Plan] standards and guidelines . . .").  In

particular, the Forest Service visited the entire route, AR 14035–71; AR 16783–85; AR

17334–41), analyzed trail areas that would experience construction and reconstruction, AR

17334–41, and considered the slope of the terrain, *see* AR 8289–93, AR 16261–62, AR

17219.  Thus, the Forest Service adequately supported " its conclusions that [the] project

meets the requirements of the NFMA and relevant Forest Plan with studies that the

agency, in its expertise, deems reliable."  *McNair*, 537 F.3d at 994.

    3.    <u>The Forest Service did not violate NFMA in determining that the Project
complies with the Revised Forest Plan's Standards and Guidelines for the
protection of aquatic resources.</u>

The Forest Service concluded that the Project will maintain and, in some cases,

improve, desired attributes of Aquatic Influence Zones ("AIZ") in the long term.  AR

14333–34; AR 14599–609; AR 16253–59; AR16980–85; AR 17000–02.  The Forest

Service argues that its predictions are reasonable and are entitled to "significant deference." Def.'s Mem., p. 28 (Dkt. 32).

The Coalition responds that the Forest Service failed to comply with the following Forest Plan standards and guidelines regarding the protection of aquatic resources:

(1)     Within legal authorities, ensure that new proposed management activities within watersheds containing 303(d) listed waterbodies improve or maintain overall progress toward beneficial use attainment for pollutants which led to listing. AR 122 (standard).

(2)     Avoid locating facilities and utility corridors in AIZs. AR 121 (guideline).

(3)     Avoid constructing roads within the AIZ unless there is no practical alternative. AR 123 (guideline).[27]

(4)     Design, construct, and operate new recreation facilities, including trails and dispersed sites, in a manner that maintains progress toward desired AIZ attributes. AR 123 (standard) .

_____

[27] This guideline relates to road building. As explained *supra*, it does not apply to a trail. Thus, it does not support the argument that the Forest Plan precludes locating "roads" in AIZs and permits such location only if there is no practical alternative. AR 122–23. However, even if the proposed motorized trail should be considered under such a guideline, the Forest Service has adequately demonstrated that no other "practical alternatives" were possible. *See* Def.'s Mem., pp. 30-31 (citing AR 14703 ("During planning level surveys, several potential trail routes were explored for feasibility, one of which included an elimination of the Two crossings of Bilk Creek. However, these alternate routes were found to be too steep for trail construction or otherwise in unsuitable locations due to soil stability or other factors. Trails are located in AIZs only when no practical alternatives exist"")). Accordingly, the Forest Service explains, "placing portions of the trail in AIZs could not be avoided." *Id.* (citing AR 14703).

(5)     Manage existing recreation facilities, including trails and dispersed sites, to minimize adverse impacts and, where feasible, move towards desired AIZ attributes.  AR 123 (guideline).

Three streams in the Project, according to the Coalition, are water quality impaired for sediment: Iowa, North Fork Eagle/Willow, and Tincup Creeks.  AR 14328.  The Coalition says that the Project is "expected to result in an increase in sediment due to construction, reconstruction, and use of the motorized trail, although the record nowhere indicates how much sediment is expected to be produced from these activities."  Pl.'s Mem., p. 23.

The record is not so barren, however.  The 2011 Addendum to the Biological Assessment supports the Forest Service's view that the Project overall will *improve* desired AIZ attributes.  *See* AR 14602–14607; *see also* AR 14326–14327 (hydrologist report explaining that proposed action will provide hydrology benefits), AR 14334 (explaining the long term benefits of the Project); AR 14603 (the Forest Service located portions of the trail in AIZs to take advantage of the existing remnants of trail); AR 14606; AR1433-34; AR 17000 (discussion of reduction of existing level of sediment delivery by constructing stable stream crossings); SAR 20782 (illustrating closures to existing primitive crossing).  The Forest Service also argues that "any short term negative effects will give way to long-term benefits."  Def.'s Mem., p. 23 (citing AR 14333) ("Effects from the new construction, including the bridges on NF Eagle, Tincup and Bilk Creek and small armored fords under this alternative would be less than the benefit from removing

most of the primitive crossings on N.F. Eagle Creek, therefore long term benefit to hydrologic resources is expected"). Thus, the Project meets the Forest Plan's standard to ensure that "new proposed management activities within watersheds containing 303(d) listed waterbodies improve or maintain overall progress," and the standard to maintain "progress toward desired AIZ attributes."[28] AR 122.

Moreover, the guidelines on which the Coalition relies emphasize the Forest Service's discretion to allow departures from those same guidelines, using language such as "avoid . . . unless there is no practical alternative," "where feasible, move towards desired AIZ attributes," and design and construct trails "in a manner that maintains progress toward desired AIZ attributes." AR 121–123. *See also* 16 U.S.C. § 1604(i) ("While standards contain mandatory constraints, guidelines allow for departures").

4. The Project Complies with NFMA

The Project seeks "to improve motorized trail opportunities and provide a unique recreation experience allowing visitors to experience mining history within the project area while reducing sedimentation and erosion caused by motorized travel within the project area." AR 14487. The Project meets the Forest Plan's recreational and environmental objectives and does not violate NFMA.

---

[28] Additional reasons support that the Forest Service's proposed alternative and the process it used to arrive at that decision, comply with NFMA. Those are set forth in detail at sections B(3), *supra*.

## CONCLUSION

Some might find it easy to criticize the decision requiring the Forest Service to revisit a portion of its prior work on this subject, particularly after the Forest Service has already completed an updated EA as a result of the agency's own administrative process. And, those who favor the result previously reached by the Forest Service may think the NEPA issue is a trivial one, or that the Forest Service's decision is sufficiently sensible in the EA's conclusory discussion of the issue, regardless of how abstract that discussion might be. Others, who criticize the Forest Service's prior decision on the Project generally, may find fault with the Court's decision to allow the Forest Service to prepare an updated EA, rather than ordering the Forest Service to go immediately to a full EIS process, and may disagree with the Court's conclusion that no NFMA violation has been established.

Ultimately, however, it is both the process and the substance of the Forest Service decision-making that is in interplay here. It is unquestionably arduous, sometimes seemingly sisyphean work, for the Forest Service to ensure compliance with the array of federal laws that govern its responsibilities, especially so when such activities potentially affect the environment, which – in the case of a resource agency – is nearly always. In addition, there are political winds that sweep through the agencies on a regular basis. There are economic constraints, particularly in the last several years, that result in good people leaving agency offices and sap the morale of those who remain. Lawsuits challenging the agency's decisions are a frequent occurrence, and there is always the

**ORDER - 42**

chance that some weave of agency work will need to be unraveled in part or in whole, if a Court so determines.

But the end goal for the Forest Service should always be to make sound decisions, based upon sufficient and reliable information, utilizing the expertise of its employees in an even-handed, transparent, and justifiable manner to accomplish its multi-faceted mission. Even though the myriad persons and groups who represent particular interests in the use and protection of the national forests may disagree about whether the Forest Service has acted properly in any particular decision affecting the forest resources, their rights in that regard should dovetail with the end goal of the Forest Service. Hence, the reason for the Forest Service to gather viewpoints and information from many different sources. Hence, the opportunity and responsibility for the Forest Service to make sound decisions incorporating such viewpoints and information. Hence, the rationale for requiring the Forest Service to explain the decisions it makes, and hopefully gain the confidence engendered in such decision-making when it is done properly and transparently.

But, on this particular issue, the process fell short. The remedy for that may be relatively simple or straightforward, depending upon the information the Forest Service already has available to consider and decide upon the issue of impacts on the RWA. In that event, if sufficiently described and explained in a supplemental EA, the Project should be ready to move forward relatively quickly. Or, the Forest Service may conclude that it needs more information to decide the issue, and begin the work needed to issue an EIS.

Regardless, it has the responsibility to make the decision for either process consistent with its duties under the law, and to do the same in making its ultimate decision on the substantive question.

## ORDER

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Dkt. 23) is GRANTED, in part, and DENIED, in part, and Plaintiff's Cross-Motion for Summary Judgment (Dkt. 33) is GRANTED, in part, and DENIED, in part, as set forth in more detail above.



DATED:  **March 31, 2014**.

Honorable Ronald E. Bush
U. S. Magistrate Judge